FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| CONTINENTAL EXPLORATION, LLC | § | CASE 15-41607-11 |
| | § | |
| DEBTOR. | § | |

**MOTION FOR ENTRY OF ORDER DIRECTING THE APPOINTMENT OF A
CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)**

**NO HEARING WILL BE CONDUCTED ON THIS MOTION UNLESS A WRITTEN OBJECTION IS FILED WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT AND SERVED UPON THE PARTY FILING THIS PLEADING WITHIN TWENTY-ONE (21) DAYS FROM THE DATE OF SERVICE UNLESS THE COURT SHORTENS OR EXTENDS THE TIME FOR FILING SUCH OBJECTION. IF NO OBJECTION IS TIMELY SERVED AND FILED, THIS PLEADING SHALL BE DEEMED TO BE UNOPPOSED, AND THE COURT MAY ENTER AN ORDER GRANTING THE RELIEF SOUGHT. IF AN OBJECTION IS FILED AND SERVED IN A TIMELY MANNER, THE COURT WILL THEREAFTER SET A HEARING. IF YOU FAIL TO APPEAR AT THE HEARING, YOUR OBJECTION MAY BE STRICKEN. THE COURT RESERVES THE RIGHT TO SET A HEARING ON ANY MATTER.**

# **TABLE OF CONTENTS**

I.     JURISDICTION ..................................................................................................1

II.    OVERVIEW ......................................................................................................1

III.   BACKGROUND ................................................................................................3

     A.     Harrington's Scheme To Embezzle Prepayments...............................3

     B.     Harrington Hid His Scheme To Embezzle Prepayments By Not Paying For Work Performed And Misrepresenting That Payments Were Made When They Were Not ...................................................7

     C.     Harrington's Scheme Extends To Production Revenues ................................11

     D.     The Debtor's Schedules Are Purposely Misleading .........................14

IV.   RELIEF REQUESTED AND BASIS THEREFORE.................................................15

     A.     Cause Exists to Direct the Appointment Of A Chapter 11 Trustee Under § 1104(a)(1) .........................................................................18

     B.     The Appointment Of A Chapter 11 Trustee Under § 1104(a)(2) Is Proper ...........................................................................................23

V.    CONCLUSION.................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

## CASES

*In re Amerejuve, Inc.,*
 2015 Bankr. LEXIS 1496 (14-35482) (Bankr.S.D. Tex. April 2015) ........................18

*In re Ashley River Consulting, LLC,*
 2015 Bankr. LEXIS 1008 (Bankr. S.D.N.Y March 2015)..........................................24

*In re Bibo, Inc.,*
 76 F.3d 256 (9 th Cir. 1996) ......................................................................17

*In re Cajun Electric Power Coop., Inc.,*
 69 F.3d 746 (5th Cir. 1995) *withdraw in part on other
 grounds,* 74 F.3d 599 (5 th Cir. 1996), *cert. denied,*
 519 U.S. 808, 117 S.Ct. 51, 131 L.Ed. 2d 15 (1996)............................................16, 23

*In re Colby Constr., Inc.,*
 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985) ................................................................17

*Dalkon Shield Claimants v. A.H. Robins Co., Inc.,*
 828 F.2d 239 (4th Cir. 1987) ......................................................................16

*In re Funge Systems, Inc.,*
 2002 Bankr. LEXIS 1937, *13 (Bankr. E.D. Va. Oct.17, 2002) ...............................17

*Hull v. Sun Refining and Marketing Co.,*
 789 P.2d 1272 (OK. 1989) ......................................................................14

*In re Intercat, Inc,.*
 247 B.R. 911 (Bankr. S.D. GA 2000).......................................................................17

*In re Ionosphere Clubs, Inc.,*
 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990).............................................................23

*In re Lowenschuss,*
 171 F.3d 673 (9th Cir. 1999) ......................................................................16

*In re Marvel Entertainment Group, Inc.,*
 140 F.3d 463 (4th Cir. 1998) ......................................................................16 , 17

*Matter of Reed,*
 700 F.2d 986, 991 (5th Cir. 1983) ......................................................................18

*Oklahoma Refining Co. v. Blaik,*
    838 F.2d 1133 (10th Cir. 1988) ...............................................................................16

*In re Patman Drilling Int., Inc.,*
    2008 Bankr. LEXIS 715 (Bankr. N.D. Tex.) ...........................................................19

*In re Professional Accountants Referral Svcs., Inc.*,
    142 B.R. 424, 428-29 (Bankr. D. Colo. 1992) .........................................................17

*In re Sanders,*
    2000 Bankr. LEXIS 263, *9 (Bankr. N.D. Ill. Mar. 2, 2000) ...................................17

*In re Sharon Steel,*
    871 F.2d at 1217 (3d Cir. 1989)..........................................................................17, 23

*Smith v. Baptist Found. Of Okla.,*
    50 P.3d 1132 (OK 2002)............................................................................................7

*In re SunCruz Casinos, LLC,*
    298 B.R. 821, 829 (Bankr. S.D. Fla. 2003)..............................................................23

**STATUTES**

42 Okl. St. § 144.2 .......................................................................................................4

52 Ok. St. § 570.10 .....................................................................................................12

11 U.S.C. § 1104(a) ............................................................................................ passim

28 U.S.C. § 133............................................................................................................11

28 U.S.C. § 157..............................................................................................................1

28 U.S.C. § 1408............................................................................................................1

28 U.S.C. § 1409............................................................................................................1

TO THE HONORABLE BRENDA T. RHOADES, U.S. BANKRUPTCY JUDGE:

COME NOW Jackal Oil Company; PetroHill Resource, LLC; Waltrip Energy, LLC; Gasco Energy, LLC; B&W Exploration, LLC; RKW Energy, LLC; HHE AS-Prospects 2005; CPE Resources, Inc.; Huntley & Huntley, Inc.; Thunder Oil & Gas; Harper Petroleum Engineering, Inc.;[1] Broughton Petroleum; Newkumet Exploration, Inc., Newkumet, Ltd., Wayne Newkumet, Individually; Wayne Newkumet as Trustee (collectively "Movants"), creditors and parties in interest herein and file this Motion for Entry of Order Directing the Appointment of a Chapter 11 Trustee Pursuant to 11 U.S.C. § 1104(a) (the "Motion") and in support thereof, respectfully state as follows:

## I.  JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 133, and venue of the Motion is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  OVERVIEW

2.     Movants assert that the appointment of a chapter 11 trustee in this case is appropriate as Continental Exploration, LLC ("Debtor") has knowingly orchestrated a scheme to embezzle and defraud the working interest and royalty owners through the Debtors role as operator of oil and gas properties in direct violation of applicable Oklahoma law. The Debtor's scheme to embezzle or defraud the working interest owners involved (i) the fraudulent use by the Debtor of approximately $1,200,000.00 in "Prepayments" made by the working interest owners, and (ii) Debtor's failure as operator to pay the working and royalty interest owners revenues of approximately $1,500,000.00 it received for their benefit from the sale of the working and royalty interest owners' oil and gas as required by applicable Oklahoma law.  The Debtor's

_____

[1] Including the interests owned by Suzanne Smith, Ted Harper, Calvin and Susan Harper, Dr. April A. Harper and George Michael Harper.

fraudulent scheme was allowed to continue for a period of years by way of Debtor's refusal to provide meaningful accounting information to the working interest owners, failure to allow an audit and by Debtor's use of "false credits" to the working interest owners' accounts which reflected that prepayments had been paid to vendors and surface owners on the oil and gas properties, when in fact they had not.

3.      As with any fraud, when the source of defrauded money dried up and the scheme was on the verge of being discovered, the Debtor, through Douglas Harrington ("Harrington") made one last attempt to retain the position and role that allowed him to conduct the fraud—he filed this bankruptcy case.   On the morning of a hearing before the Oklahoma Corporation Commission that would likely have removed Debtor (and Harrington) from the position that has allowed it to defraud and embezzle, Harrington caused the Debtor to file this bankruptcy case.[2] In fact, just prior to Harrington causing the Debtor to file this bankruptcy case, the working interest owners of multiple wells that the Debtor operates voted to remove Debtor as operator under the applicable joint operating agreements.   During the time that this bankruptcy case has been pending, Harrington has made it clear that he is using the bankruptcy process to prevent the working interest owners from exercising their statutory and contractual rights to remove Debtor as operator while protecting the assets that the Debtor, through Harrington, paid for and obtained via embezzlement and fraud.   These facts, as discussed in detail below, constitute cause under section 1104 of the Bankruptcy Code for this court to direct the appointment of a chapter 11 trustee.

---

[2] The hearing before the Oklahoma Corporation Commission actually proceeded for the entire morning of September 2, 2015 until the Debtor's Oklahoma counsel notified the Oklahoma Corporation Commission that this bankruptcy case had been filed.   The filing of this bankruptcy case also stayed multiple other lawsuits in Texas and Oklahoma wherein working interest and royalty interest owners were seeking an accounting and revenues that Debtor refused to pay.

# III.    BACKGROUND

4.      The Debtor claims to be in the oil and gas exploration business.  The Debtor is owned and controlled by its sole officer and director, Harrington.  Harrington makes and made all financial and operation decisions for the Debtor.[3]  The Debtor claims to own working interests or royalty interests in over 1,100 wells and claims that a majority of its revenue is generated from its interest in the 1,100 plus wells.  The Debtor also claims that it is the operator of approximately 40 wells—of which approximately 35 are actually producing oil or gas.

5.      Movants are working interest and royalty interest owners who separately and independently own working interests and royalty interests in 2 to 17 wells or proposed wells on leaseholds and/or pooled units in Oklahoma (the "Properties") which the Debtor operates.

## A.    Harrington's Scheme To Embezzle Prepayments.

6.      Part of Harrington's scheme to defraud working interest owners was to use the Debtor's ability to obtain prepayments from working interest owners via proposals to drill and complete wells.  As the operator of the Properties and in order to drill or complete oil and gas wells on the subject Properties, the Debtor submitted proposals to the various working interest owners for each well or property (the "Proposals").  The Proposals included a proposal to drill a new well, a proposal to complete a well or both.  The Proposals sent to the working interest owners included an Authorization for Expenditure ("AFE") which is an itemization of the work to be completed under the Proposal, broken down by task and cost.  Pursuant to the applicable joint operating agreement, the working interest owners must elect to participate in the drilling or

---

[3] Harrington made the decisions for the Debtor to drill and complete wells, to send Proposals to working interest owners regarding the drilling and completion of wells and when and to whom Debtor paid money—including Prepayment funds and production revenue.  Testimony of Harrington, 09/22/2015, pg. 8-9.

completion of a well, pay its share of costs or lose their working interest in the well.  In order to participate in the well, or completion of existing wells or Properties the working interest owners are required to pre-pay to the Debtor the working interest owners' proportionate amount of the AFE inside of the Proposal (a "Prepayment") or face a reduction or elimination of their interest. The monies paid by each working interest owner are to be used solely for the specific expenses set forth in the Proposal.  The operator (Debtor) shall not use the Prepayment monies for any other purpose.  *See* 42 Okl. St. § 144.2.

7.      Once a working interest owner makes a Prepayment to the Debtor in response to a submitted Proposal, the Debtor is required to hold the monies paid "as trust funds for the payment of all lienable claims due and owing by such operator, contractor, or subcontractor by reason of such drilling contract, operating agreement or force pooling order…" 42 Okl. St. § 144.2 (emphasis added) (the "Trust Fund Act").[4]  Further the "trust funds created under [the Trust Fund Act] shall be applied to the payment of said valid and lienable claims and no portion thereof shall be used for any other purpose until all lienable claims due and owing or to become due and owing shall have been paid."  *Id.* (emphasis added).  In other words, the Debtor is required to pay the vendor claims which are the subject of the Proposal or hold all Prepayments made by any working interest owner in the Properties in trust.  Under Oklahoma law, the operator is expressly forbidden from spending such funds on anything other than the expenses set forth in the Proposal.

8.      From 2013 through 2014 the Debtor submitted multiple Proposals to the working interest owners for the Properties.  Pursuant to such Proposals, Debtor received in excess of $4,500,000.00 from working interest owners in the form of Prepayments.  Debtor has admittedly

---

[4] The Properties are located in Oklahoma and the pooling order, joint operating agreements and other contracts between the Debtor and the Movants require the application of Oklahoma law.

failed to drill at least two wells for which it received in excess of $440,000.00 in Prepayments from the working interest owners. Likewise, the Debtor has failed to fully complete at least three wells that it collected over $2,700,000.00 in Prepayments from the working interest owners. The Debtor should have had approximately $1,200,000.00[5] remaining in its operating account representing the Prepayments not spent under the Proposals.

9.      However, Debtor admitted that it did not use all of the Prepayment monies to complete the wells. In fact, when Debtor filed this bankruptcy case it had less than $4,500.00 in its operating accounts—the accounts that Harrington testified held the pre-payment monies. It is now clear that the Debtor submitted the Proposals to the working interest owners with the intent to use funds paid by the working interest owners to fund Debtor's other, wholly separate, assets and investments.

10.     Despite Harrington acknowledging that the Debtor must operate the Properties in accordance with Oklahoma law—which includes the Trust Fund Act—Harrington's position appears to be that the Debtor is not required to hold the Prepayments to pay the specific expenses for the specific wells under the Proposal for which the Prepayments were paid.

Q.      If those Prepayments come in and are put in the operating account and that well is not drilled, does Continental ever draw down that operating account below the amount of payments that were paid?

A.      Yes

Q.      …And what do they use that money for…

A.      Everything that we do.

Q.      What does Continental, what is it that "we" do that "we" use those Prepayment monies for?

---

[5] Based on the records produced to date by the Debtor, it should be holding approximately $440,000.00 in unused Prepayments for drilling Proposals and approximately $770,000.00 in unused Prepayments for completion Proposals.

A.    …Every facet of the oil business.  The company is pretty big, and…so it uses – it operates.  It pays salaries, it pays rent, <u>it invests in wells, invests in land</u>…it drills wells.

Harrington Deposition at pg. 25, ln. 5-22 (emphasis added).

Q.    Mr. Harrington, is it Continental's position that once pre-payments are made by working interest owners to Continental…that money becomes Continental's money?

A.    Yes.

Testimony of Harrington, 09/22/2015, pg. 28, ln. 3-9.

11.    When asked where are the Prepayment funds not spent on the specific wells, Harrington responded with "I don't know" or "I don't know how to answer that."  Testimony of Harrington, 09/22/2015, pg. 27 ln. 13-18, pg. 33, ln. 23-24, Harrington Deposition at pg. 58 ln. 16-25, pg 74-75 ln. 21-15.  The truth of the matter is that the Prepayments were simply part of Harrington's scheme to fraudulently take the working interest owners' funds and invest in new wells, properties and assets for the sole benefit of Debtor.  In fact, between January 2013 and December 31, 2014—the time period when a majority of the Prepayments were made by working interest owners to the Debtor—the Debtor made the following payments from its operating account:

| | |
|---|---|
| XTO (for wells that Debtor does not operate) | $1,255,547.27 |
| EnergyNet.com (an online oil and gas asset auction company) | $ 474,429.67 |
| Oklahoma Commissioner Land Office (to lease state lands) | $ 91,112.24 |
| Ancient Seas (a company wholly owned by Harrington)[6] | $1,119,600.00 |
| Continental Exploration (inter-company checks) | $ 468,622.85 |

[6] Movants acknowledge that a portion of the funds transferred from Debtor to Ancient Seas consist of payment of overhead costs (ie, employee salary and rent) for the Debtor.  However, the Debtor is only able to collect approximately $600 per well that it operates to cover these overhead expenses.  Assuming Debtor actually operates 35 producing wells, the total amount that Debtor could transfer to Ancient Seas to cover overhead expenses is $504,000.00.

MOTION FOR ENTRY OF ORDER DIRECTING THE APPOINTMENT OF A
CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a)                    PAGE 6

12.     In short, Harrington's scheme worked, the Debtor used the working interest owners' money to purchase and pay for assets for its own account and to pay bills and expenses unrelated to the wells and Properties which were the subject of the various Proposals.  The Debtor knowingly and intentionally defrauded the working interest owners by using the working interest owners' money for the Debtor's own account rather than for the account of the working interest owners.[7]

13.     The Debtor (Harrington) acts as the trustee of the Prepayment funds paid to it pursuant to the Trust Fund Act.  The Debtor's, specifically Harrington's, affirmative use of the working interest owners' Prepayments to run its business and invest in other assets constitutes a breach of fiduciary duty owed to the working interest owners.  *Smith v. Baptist Found. of Okla.,* 50 P.3d 1132, 1144 (OK 2002)("A trustee is a fiduciary of the highest order in whom the hope and confidence of the settlor are placed with the expectation that the trustee will exercise the obligations of the office for the exclusive benefit of those holding beneficial interests. Without exception, a trustee owes its beneficiaries the most abundant good faith, absolute and perfect candor, openness and honesty.").

**B.     Harrington Hid His Scheme To Embezzle Prepayments By Not Paying For Work Performed And Misrepresenting That Payments Were Made When They Were Not.**

14.     Not only did the Debtor (through Harrington) spend the working interest owners' Prepayments out of trust, once the Debtor actually contracted for work to be performed that was set out in a Proposal (and which had been prepaid by the working interest owners), the Debtor did not have the money to pay for the work performed.  Instead, Debtor would simply not pay

---

[7] The joint operating agreements state that the operator may require the non-operator to advance their share of estimated cash outlay for the succeeding month's operation.  It was clearly the intent of the Debtor to not use all of the Prepayment funds for what it proposed.

many of the vendors who performed the work on the Properties which had been prepaid by the working interest owners, exposing the working interest owners' assets to liens and encumbrances.

15.     For example, just prior to filing this case the Debtor requested and caused vendors to conduct hydraulic fracturing "fracking" of the Logan Beard 3-25 well.[8]  The Debtor obtained Prepayments from the working interest owners to pay for the fracking in May and June of 2014, in excess of a year before the work was performed which is a violation of the joint operating agreement, but Harrington caused the Debtor to use the Prepayment funds for its own benefit.  At the time that the Debtor contracted for the fracking to be performed, it did not have the funds to pay the fracking bill and now owes at least $150,000.00[9] for work performed for which it cannot pay.  Through similar actions the Debtor (Harrington) has caused multiple liens to be filed against the working interest owners' interest in the Properties and caused the working interest owners to be sued in Oklahoma.

16.     In an effort to cover up his scheme to defraud, Harrington caused the Debtor to provide the working interest owners multiple joint interest billings showing that many of the drilling or completion expenses conducted by third parties were paid.  However, Harrington did not and would not pay the vendors despite "crediting" the working interest owners' prepayment account and representing to the working interest owners that their Prepayments had been used to pay the expenses incurred.  In other words, the Debtor represented to the working interest owners that their Prepayments had been used to pay for work on specific Properties when they had not

---

[8] As discussed in more detail herein, the Proposal to complete the Logan Beard 3-25 well had expired; thus, the Debtor violated the joint operating agreement when it ordered and incurred the debt to frac the well.

[9] The joint interest billing for the Logan Beard 3-25 allegedly representing expenses through August 31, 2015, the Debtor lists expenses of $163,444.40 for the frac work conducted in August 2015.  The joint interest billing includes over $10,000.00 of charges for alleged costs for work that the Debtor alleges it actually conducted on the Logan Beard 3-25—the Movants dispute such charges.

and that certain bills and expenses incurred against the Properties had been paid when they had not.  During the short time that this bankruptcy has been on file, the Movants have uncovered hundreds of thousands in false and fraudulent credits to the Prepayment accounts.

17.     By way of example, many of the working interest owners have been sued by Logan Beard, the surface owner of at least 6 of the wells operated by Debtor, due to Debtor not paying Logan Beard for damages to the surface estate while drilling and operating various wells. Debtor collected between $125,000.00 and $150,000.00 in Prepayments from the working interest owners to pay Logan Beard for surface damages through a Proposal or series of Proposals.  In July of 2014 Debtor issued joint interest billings to all applicable working interest owners representing that the funds collected had been paid to Logan Beard.  However, in August of 2015 Logan Beard sued the Movants, numerous other working interest owners and the Debtor for payment of the surface damages plus treble and punitive damages.  Though representing to the working interest owners that it had used the Prepayment funds to pay $125,000.00 to $150,000.00 to Logan Beard, the Debtor in fact never paid such monies to Logan Beard.  To make things even worse, the Debtor no longer has the funds collected to pay Logan Beard, much less any additional damages sought by Logan Beard in the pending lawsuit.

Q.      …so inside of those pre-payments included that $150,000…that were paid by working interest owners to Continental.

A.      The original pre-payments had been made, yes.

Q.      Did any of that $150,000 get paid to Logan Beard or Mary Lou Beard?

A.      No…

Q.      Has any money been paid for the surface damages to Logan Beard or Mary Lou Beard.

A.      No, it has not.

Q.      But that $150,000, that's no longer in Continental's bank accounts, is it.

A.      No, it isn't.

Testimony of Harrington, 09/22/2015, pg. 35-36, ln. 23-18.

18.     To compound the problem, Harrington, on behalf of the Debtor testified that the Debtor intends to incur new costs to complete and drill the wells that Proposals for which the working interest owners have already paid, but which the Debtor no longer holds the Prepayments:

Q.      Does Continental anticipate in the next six months drilling any new wells?

A.      Yes

…

Q.      Are there drilling Proposals outstanding?

A.      Yes, there – well, under my interpretation there is.

Q.      And monies paid from working interest owners or participants?

A.      Yes.

Q.      And Continental is still going to go ahead and drill those wells?

A.      I would say that they – there's a very good chance that they are.

…

Q.      …Does Continental Exploration intend to complete any other wells in the next six months?

A.      Yes.

Q.      …Are there outstanding Proposals to complete those wells?

A.      Yes.

Q.      Have Prepayments been made to complete those wells?

A.      Yes.

Harrington Deposition at pg. 44-46, ln. 1-9.

19.      The Debtor had less than $4,500.00 in its operating accounts when it filed this bankruptcy case.  The Debtor, while under the control of Harrington, fully intends to incur additional costs and fees that, in the end, may be charged (or liened) against the working interest owners' property.  The problem with Debtor's "plan" is that the Proposals under which Debtor intends to complete or drill wells have expired and the Debtor cannot drill or complete any well without submitting and obtaining consent under a new Proposal.[10]  The working interest owners simply will not support or agree to allow Debtor to operate their assets after discovering the blatant fraudulent scheme carried out by the Debtor.  In fact, prior to the Debtor filing this bankruptcy case, a sufficient amount of working interest owners balloted to remove Debtor as operator from a number of the wells in southern Oklahoma.

**C.      Harrington's Scheme Extends To Production Revenues.**

20.      Unfortunately, Harrington's scheme to defraud was not limited to the Prepayments.  The Debtor's mishandling of funds that belong to the working interest owners is not limited to Prepayment funds.  After the filing of this bankruptcy case, Movants uncovered the fact that the Debtor routinely used the working interest and royalty interest owners' separate property revenues from the production of oil and gas from wells which the Debtor operates for

---

[10] The applicable joint operating agreement(s) provide:

> Operator shall, within ninety (90) days after expiration of the notice period of thirty (30) days (or as promptly as possible after the expiration of the forty-eight (48) hour period when a drilling rig is on location, as the case may be), actually commence the proposed operation and complete it with due diligence at the risk and expense of all parties hereto' provided…if the actual operating has not been commenced within the time provided (including any extension thereof as specifically permitted herein) and if any party hereto still desires to conduct said operation, written notice proposing same must be resubmitted to the other parties in accordance with this provision hereof as if no prior proposal had been made.

*See* Article VI ¶ B of the joint operating agreements.

its own benefit.  As of the petition date, the Debtor should have been holding approximately $1,500,000.00 in production revenue that belongs to working interest and royalty interest owners.  On the petition date, the Debtor had less than $17,000.00 in its revenue accounts.  The Debtor not having the $1,500,000.00 of production revenue which constitutes the separate property of the various working interest owners is a clear and direct violation of Oklahoma law governing an operator's handling and payment of production revenues and is another instance of fraud and embezzlement on Harrington's part.  The refusal to timely turn over the working interest and royalty interest owners' revenue violates the Oklahoma Production Revenue Standards Act which mandates that:

> All proceeds from the sale of production shall be regarded as separate and distinct from all other funds of any person receiving or holding the same until such time as such proceeds are paid to the owners legally entitled thereto. Any person holding revenue or proceeds from the sale of production shall hold such revenue or proceeds for the benefit of the owners legally entitled thereto…
>
> Proceeds from the sale of oil or gas production from an oil or gas well shall be paid to persons legally entitled thereto:
> a. commencing not later than six (6) months after the date of first sale, and
> b. thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold.

52 Ok. St. § 570.10 (the "Revenue Standards Act").

21.     Specifically, pursuant to the Debtor's response to question 14 of the Debtor's Statement of Financial Affairs ("SOFA"), the Debtor collected over $690,000.00 in revenues on behalf of working interest and royalty interest owners which it has not paid.  The Debtor's response to question 14 on its SOFA, however, excludes revenues collected by the Debtor from wells not listed and for working interest owners not listed.  Thus, the actual amount of working interest and royalty interest owner revenues that the Debtor has collected, but not paid, is

approximately $1,500,000.00.[11]   The Debtor testified that when it received these revenue payments, the payments were deposited into a "revenue account" at either J.P. Morgan Chase or Wells Fargo but remained unpaid.  Harrington admitted that such revenues are not the property of Debtor, but constitute the property of the working interest and royalty interest owners. Harrington Deposition at pg. 62-63, ln. 8-3; Testimony of Harrington, 09/22/2015, pg. 39, ln. 11-19. Despite acknowledging that such revenues constitute the property of the working interest and royalty interest owners, the Debtor, at the direction of Harrington, spent the working interest and royalty interest owners' money to purchase new assets exclusively for the benefit of the Debtor, paid expenses related to properties and assets owned exclusively by the Debtor and to pay the bills for the Debtor's separate obligations.

22.     Pre-petition the working interest and royalty interest owners have been attempting to uncover Harrington's scheme.   Multiple working interest owners' continuously requested documentation, accountings and statements showing both the use of their Prepayment funds and the status of their revenues held by Debtor.  The Debtor refused to provide such documentation reflecting the status of the working interest owners' funds.  When the working interest or royalty interest owners would demand payment of their revenues, Harrington would either not responds or provide an excuse that was simply not supported by the facts or law under which the Debtor was operating.  For instance, both pre and post petition the Debtor (through Harrington) asserted that the Debtor would not pay working interest or royalty interest owners their revenue until they signed a division order.   However, over two decades ago the Oklahoma Supreme Court affirmatively struck down such an argument, holding that the lack of a signed division order does not absolve the operator's requirement to pay production revenues under the Oklahoma

---

[11] At this time, the Movants cannot accurately determine the exact amount of production revenues that the Debtor has not paid due to the Debtor's refusal to provide all statements showing the purchase and sale of oil and gas from the Properties.

Production Revenue Standards Act.  *Hull v. Sun Refining and Marketing Co.,* 789 P.2d 1272 (OK. 1989).  (…requiring execution of a division order as a condition precedent to recovery would create a condition for payment neither expressly nor impliedly imposed by the Legislature in a statute written in clear and unambiguous terms.")

23.     In fact, many of the working interest and royalty interest owners were left with no option but to file suit against the Debtor seeking an accounting and the payment of their funds.  It was not until this bankruptcy case was filed that the Debtor was required to turn over some (but not all) of the documentation which had been previously requested—for the first time shedding light on the fraudulent scheme that the Debtor was conducting with the working interest and royalty interest owners' money.

**D.     The Debtor's Schedules Are Purposely Misleading.**

24.     On September 30, 2015 the Debtor filed its bankruptcy schedules ("Schedules") and SOFA *See* [Docket No. 48].  The Debtor's Schedules and SOFAs are intentionally and materially misleading.  For example:

- The Debtor hyper inflated the value of its oil and gas assets.  The Debtor has a combined listed value of its oil and gas assets of over $80,000,000.00.  The Debtor, specifically Harrington, professes to have been in the oil and gas business for decades, yet the valuation of its oil and gas assets was not conducted or reviewed by an engineer and is not supported by a reserve report.  Instead, the known hyperinflation of the Debtor's oil and gas assets is based on Harrington's "analysis."

- The Debtor has habitually understated the amounts due to working interest owners from un-used Prepayments due to the Debtor reporting that Prepayment

funds have been paid to vendors when they have not.  Therefore, the amount listed in the Debtor's Schedules to working interest owners for Prepayments owed is substantially understated.

- The Debtor failed to list numerous lawsuits which it is a party to.  Many of the lawsuits that were not listed were filed by working interest owners who are seeking an accounting and damages for the Prepayment monies and the production revenues not paid.

- The Debtor failed to list production revenue attributable to multiple working interest and royalty interest owners on its response to question 14 on its SOFA.  In fact, the actual dollar amount of revenue owed to working interest and royalty interest owners for production revenue is likely double the amount listed by the Debtor.

- The Debtor overstated gross income in response to question 1 of its SOFA by including monies received by the Debtor as "income" when such funds received where not the Debtor's funds.  Specifically, the gross revenue listed under SOFA 1 for 2013 through current includes monies received by the Debtor as Prepayments and production revenue received by the Debtor that belongs to working interest and royalty interest owners not the Debtor, making Debtor's answer to question SOFA 1 intentionally misleading.

## IV.    RELIEF REQUESTED AND BASIS THEREFOR

25.    Section 1104(a) of the Bankruptcy Code provides that at any time after the commencement of a chapter 11 case, but prior to confirmation of a plan, a bankruptcy court shall order the appointment of a trustee:

(1)   for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2)   if such appointment is in the best interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).  As the two subsections of section 1104(a) are written in the disjunctive, the Movants need only establish one of the two standards for appointment of a chapter 11 trustee.  *In re Lowenschuss*, 171 F.3d 673, 685 (9th Cir. 1999) (satisfying either one of section 1104(a)'s independent grounds is sufficient to appoint a trustee).  Section 1104(a) is flexibly applied since the "concepts of incompetence, dishonesty, gross mismanagement and even fraud all cover a wide spectrum of conduct." *Dalkon Shield Claimants v. A.H. Robins Co., Inc.,* 828 F.2d 239, 242 (4th Cir. 1987).  Further, Section 1104(a)(1) does not define the term "cause" but merely notes that "cause" includes "fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management either before or after commencement of the case." Section 102(3) provides that the terms "includes" and "including" are not limiting; thus, cause for purposes of section 1104(a)(1) is not limited to fraud, dishonesty, incompetence or gross mismanagement.

26.     A moving party has the burden of showing by "clear and convincing evidence" that the appointment of a trustee is warranted.  *In re Cajun Electric Power Coop., Inc.*, 69 F.3d 746, 749 (5th Cir. 1995), *withdrawn in part on other grounds*, 74 F.3d 599 (5th Cir. 1996), *cert. denied*, 519 U.S. 808, 117 S. Ct. 51, 136 L. Ed. 2d 15 (1996); *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 471 (4th Cir. 1998).  In making its determination, the Court may examine both pre- and post-petition conduct of the Debtor and those in control of the Debtor.  *Oklahoma*

*Refining Co. v. Blaik (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re Sanders*, 2000 Bankr. LEXIS 263, *9 (Bankr. N.D. Ill. Mar. 2, 2000).

27.     If cause is found under section 1104(a)(1), the appointment of a chapter 11 trustee is mandatory. 11 U.S.C. § 1104(a) ("the court *shall* order the appointment of a trustee − (1) for cause….") (emphasis added); *Marvel Entertainment Group, Inc.*, 140 F.3d at 472; *In re Funge Systems, Inc.*, 2002 Bankr. LEXIS 1937, *13 (Bankr. E.D. Va. Oct. 17, 2002).

28.     Diversion of funds, misuse of corporate assets and providing false reportings constitute fraud or dishonesty sufficient to warrant appointment of a trustee under Section 1104(a)(1). *See, e.g., In re Intercat, Inc.* 247 B.R. 911 (Bankr. S.D. GA 2000)(intentional diversion of funds, misuse of corporate assets, usurping royalty payments and improper reporting to royalty interest holder constitutes cause to appoint a trustee); *In re Bibo, Inc.*, 76 F.3d 256, 257-58 (9th Cir. 1996)(appointment of a trustee was mandated where management had siphoned funds from the debtor); *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989) (systematic syphoning of debtor's assets to other companies under the owner's common control constituted cause for appointment of trustee); *In re Professional Accountants Referral Svcs., Inc.*, 142 B.R. 424, 428-29 (Bankr. D. Colo. 1992)(diversion of corporate assets for professional use constituted dishonesty or gross mismanagement which required the appointment of a trustee); *In re Colby Constr., Inc.*, 51 B.R. 113, 116 (Bankr. S.D.N.Y. 1985) (majority shareholder's "deliberate and unabashed conversion of corporate assets to acquire another company in his own name indicates the scienter implicit in fraud as that term is used in § 1104(a)(1) or at least the dishonesty contemplated by that section").

A.      **Cause Exists To Direct the Appointment Of A Chapter 11 Trustee Under §
1104(a)(1).**

29.     Harrington's scheme to defraud constitutes cause to direct the appointment of a

chapter 11 trustee.  Judge Bohm recently found in a case mirroring some of the facts herein that

the intentional mis-use of funds entrusted to a debtor supported a fraud, embezzlement and

dishonesty finding and was sufficient to constitute "cause" to direct the appointment of a trustee.

*In re Amerejuve, Inc.,* 2015 Bankr. LEXIS 1496 (14-35482) (Bankr. S.D. Tex. April 2015).

Amerejuve, Inc. was a business wholly owned and controlled by Morteza Naghavi.   Prior to

Naghavi causing Amerijuve to file a chapter 11 petition, he used payroll funds that were to be

retained, in trust, by Amerijuve to pay for expenses related to assets that were unrelated to the

purpose of the monies held in trust.   In holding that cause existed to direct the appointment of a

trustee, Judge Bohm found that due (1) to Nagahav being the person that controlled the finances

of Amerijuve, (2) the IRS and Amerijuve's employees wanted the funds to be used to pay the

employment taxes of Amerijuve's employees, (3) Nagahavi not properly accounting for the

funds that he, through Amerijuve, held and (4) Nagahvi did not provide the IRS or the employees

for whose employment taxes were withheld with a complete and accurate accounting of exactly

how the misappropriated funds were spent.   Finally, Judge Bohm also found based on the same

facts, that Nagahvi's fraud and fraudulent intent was clear from the totality of the circumstances.

*Id.* at 29 citing *Matter of Reed,* 700 F.2d 986, 991 (5th Cir. 1983).

30.     Harrington has admitted that he is the sole person who determines when and for

how much Proposals are sent to working interest owners.  Harrington has admitted that he has

sole authority over when, to whom and the amount that Debtor pays any money.  Harrington has

admitted that he caused the Debtor to use the Prepayments to pay for unrelated expenses of the

Debtor and invest in unrelated assets.  Harrington has admitted that though the Debtor owes a

tremendous amount of production revenues to working interest and royalty interest owners, the Debtor no longer has the working interest and royalty interest owners' production revenues in its account. Harrington, through the Debtor either refused to provide documentation regarding the misappropriated Prepayment and production revenue funds or provided false and misleading information regarding such funds. Moreover, the Debtor, through Harrington, refused to return the Prepayments that were not used to drill or complete the proposed wells and refused to tender production revenues to working interest and royalty interest owners.

31. Due to the foregoing, there clearly exists a conflict of interest between the Debtor's bankruptcy estate and Harrington. There can be no doubt that the Debtor holds director and officer claims against Harrington due to his actions of causing the Debtor to defraud the working interest and royalty interest owners then misappropriate and embezzle funds. Further, in the limited information that the Debtor has provided, the Debtor has disclosed over $1,000,000.00 of transfers to Ancient Seas Exploration and Development, LLC—an entity solely owned and controlled by Harrington. There can be little doubt that the Debtor, while controlled by Harrington, will not investigate such transfers and will not pursue claims against Ancient Seas Exploration and Development, LLC for the return of such funds. A conflict of interest between the Debtor and the current management of the Debtor is sufficient cause to direct the appointment of a trustee under Section 1104(a)(1). *In re Patman Drilling Int., Inc.* 2008 Bankr. LEXIS 715 (Bankr. N.D. Tex.)("'Cause' exists in this case because of the over whelming conflicts of interest of the Debtor's management, as well as clear and convincing evidence of some combination of dishonesty, incompetence, or gross mismanagement of the affairs of the Debtor by [the Debtor's current management].").

32.     Cause also exists for the appointment of a chapter 11 trustee as set forth herein and for the following reasons:

a.      The Debtor submitted false or fraudulent Proposals for the drilling and completion of wells to the working interest owners.

b.      The Debtor did not intend to commence or perform the work outlined in Proposals for the drilling and completion of wells.

c.      The working interest owners paid over $4,500,000.00 to the Debtor under multiple Proposals and, rather than drill or complete the wells as proposed, the Debtor used over $1,200,000.00 of Prepayment funds received to operate its business, including investing in other wells, leaseholds and properties in its own name.

d.      The Debtor refused to account for, hold and use Prepayment funds obtained from the working interest holders in trust pursuant to the Trust Fund Act.

e.      The Debtor refused to provide accountings and information to working interest owners regarding the Prepayment monies even though required to do so under the applicable statutes and various joint operating agreements.

f.      The Debtor refused to tender the Prepayment funds not used on the wells as proposed back to the working interest owners.

g.      The Debtor incurred substantial charges and liens against the working interest owners' assets (the Properties) because the Debtor did not have the funds to pay completion and drilling expenses even though the working interest and royalty interest owners had prepaid for the expenses.  The stark reality is the Debtor does not have the funds to pay the drilling and completion expenses because it used the Prepayment funds earmarked for such expenses for its own benefit.

h.     The Debtor submitted joint interest billings to the working interest owners which represented that vendor expenses had been paid using Prepayment funds when (i) such expenses had in fact not been paid and (ii) for which the Debtor no longer possesses the Prepayment funds it represented were tendered to creditors.

i.     The Debtor believes and testified on multiple occasions that the Prepayment funds constitute monies owned by the Debtor.  In fact, in response to question 1 in the Debtor's SOFAs, the Debtor lists its "gross income" which includes Prepayment monies paid by working interest owners to the Debtor.

j.     Despite working interest and royalty interest owners' multiple requests, the Debtor failed and refused to pay approximately $1,500,000.00 in oil and gas production revenues to working interest and royalty interest owners in direct violation of the Oklahoma Revenue Standards Act.

k.     The Debtor used production revenue from oil and gas wells that it operates which belong to third party working interest and royalty interest owners to operate its business and invest in other assets and properties in its own name.

l.     The Debtor paid substantial funds from its bank account(s) to Ancient Seas Exploration and Production, LLC—a company wholly owned and controlled by Harrington.

m.     The Debtor refused to allow working interest owners to be placed in direct pay from oil and gas purchasers when requested because to do so would gut the Debtor's scheme to defraud the working interest and royalty interest owners.

n.      The Debtor consistently refused to provide accountings and information to working interest and royalty interest owners regarding their production revenue are required which would have shed light on the Debtor's fraudulent scheme.

o.      The Debtor has filed misleading and known incorrect Schedules and Statements of Financial Affairs in an attempt to cover up his scheme to defraud the working interest and royalty interest owners.

p.      The Debtor violated the Oklahoma Surface Damages Act by not obtaining the proper authority or agreements to commence oil and gas operations on multiple Properties which it operates.  Instead, the Debtor affirmatively represented to the working interest owners that it had complied with the Oklahoma Surface Damages Act when the Debtor (Harrington) knew that it had not.

q.      The Debtor commenced completion work on wells under Proposals that expired under the applicable joint operating agreement without first re-submitting a Proposal to the working interest owners.  The Debtor further testified that it intends to complete and drill wells under now expired Proposals in direct violation of the applicable joint operating agreements.  However, the Debtor's Proposal to drill two additional wells (the Logan Beard 5-25 and the Douglas Harrington 226) have expired as well as the Oklahoma Corporate Commission's order allowing such wells to be drilled.  Further, due to Debtor's current status, it is unlikely that the Debtor would be able to obtain the required permits necessary to drill a well on the Properties.

33.     Harrington's scheme, orchestrated through the Debtor, and all of the conduct and actions thereunder constitute the necessary fraud, dishonesty, incompetence, gross mismanagement of the affairs of the Debtor by Harrington to direct the appointment of a trustee.

**B.      The Appointment Of A Chapter 11 Trustee Under § 1104(a)(2) Is Proper.**

34.      The Court may also appoint a trustee under section 1104(a)(2), even in the absence of cause under section 1104(a)(1).  11 U.S.C. § 1104(a)(2); *see also Sharon Steel,* 871 F.2d at, 1226 ("Subsection (a)(2) allows appointment of a trustee even when no cause exists."); *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (same).  Indeed, section 1104(a)(2) provides the Court the flexibility to appoint a trustee if it is in "the interests of creditors, any equity security holders, and other interests of the estate."  *Sharon Steel*, 871 F.2d at 1226.  When analyzing whether the appointment of a trustee is in the creditors' best interests of creditors or the estate, the court should consider both the protections that will be afforded by the appointment of a trustee and the relative cost that is associated with the appointment.  *See Cajun,* 191 B.R. 659, 661.  But when the need for a trustee becomes unavoidable to protect parties in interest, then the cost/benefit factor carries little weight, since the goal of protecting creditor interest is paramount to the goal of minimizing costs to the estate.  *In re SunCruz Casinos, LLC,* 298 B.R. 821, 829 (Bankr. S.D. Fla. 2003) ("If the appointment of a trustee becomes unavoidable in the protection of parties in interest, the cost/protection factor must necessarily supersede a cost/benefit factor, even to the extent of a depletion of the estate.").

35.      For the same reasons that cause exists to direct the appointment of a chapter 11 trustee under Section 1104(a)(1), the appointment of a trustee is in the best interest of the creditors and the bankruptcy estate under Section 1104(a)(2).  Indeed, the appointment of a trustee is in the best interest of the estate and may provide the only manner in which the Debtor can successfully reorganize.

36.      As evidenced by the pre-petition conduct of the Debtor while being controlled by Harrington and the information discovered post petition by the working interest and royalty

interest owners, there is a demonstrated lack of trust and confidence in Harrington's management of the Debtor. *In re Ashley River Consulting, LLC,* 2015 Bankr. LEXIS 1008 (Bankr. S.D.N.Y March 2015)(in directing the appointment of a trustee, finding that "…it is clear to this Court that the Debtors, under Longman's control, are not trustworthy and do not deserve the confidence of the creditors…There are several other fiduciary obligations debtors-in-possession must carry out with or without liquid assets and Longman and Emerald have previously been found to have failed to abide by corporate formalities even when obligations that rise to a fiduciary level were not in question."). Harrington's inability to comply with his pre-petition fiduciary duties to the Debtor and the working interest owners, combined with Harrington's pre-petition scheme to defraud the working interest and royalty interest owners instills no confidence in the working interest and royalty interest owner contingent that Harrington will adhere to the fiduciary duties imparted to the Debtor in this bankruptcy case.

37.      The appointment of a chapter 11 trustee is also in the best interest of the Debtor's bankruptcy estate. The Debtor obtains a substantial amount of its income from its working interest and royalty interests in oil and gas properties (excluding the improper use of Prepayment and revenue funds). The Debtor holds working interests (separate from its operating interest) in the Properties in southern Oklahoma ranging from 10% to as high as 30% + per well. Many of the properties in southern Oklahoma need to be completed, re-worked or potentially drilled— namely the wells which Debtor submitted Proposals but absconded with the Prepayment funds. The Debtor admittedly does not have the funds to complete such work, though Harrington has testified that the Debtor intends to have the work performed. Pursuant to the applicable joint operating agreements that govern the operator's actions as to the Properties, in order for any work to be performed on the properties the operator (Debtor) must issue new Proposals. The

Movants, and likely most other working interest owners, will not approve or elect to participate in any Proposal submitted by the Debtor while Harrington is in control.  If proper and needed additional work is performed on the wells and Properties, the Debtor's estate stands to be the beneficiary of an increase in its gross revenue—potentially allowing it to reorganize.  However, due to the past fraudulent and improper conduct of Harrington, the working interest owners simply will not agree to participate in any projects or Proposals submitted by Harrington, through the Debtor.  Likewise, due to the Debtor's failure to pay the surface owners (ie Logan Beard) for surface damages incurred causes a risk that the surface owners will lock out the Debtor from monitoring, repairing, operating or completing the existing wells.  The Debtor's estate will benefit from the appointment of a chapter 11 trustee.

## V.    CONCLUSION

38.    Harrington has used the cover of the Debtor as operator of the Properties to carry out a scheme to misuse, abscond and embezzle millions of dollars constituting Prepayment monies held in trust and revenue monies that the Debtor admits do not belong to it.  The Debtor consistently used those funds to invest in properties and assets in its own name and to pay its separate bills on other assets.  Now the Debtor, through Harrington, comes to the bankruptcy court on the eve of trial which would have removed the Debtor from the operator position that he used to defraud the working interest and royalty interest owners and is asking this Court to allow him to continue operating in the position that he abused.  Harrington, through the Debtor, is using this bankruptcy case as a shield against the fraud he conducted—in essence trying to use this bankruptcy court as an unwilling participate in Harrington's fraudulent scheme.  Cause exists to direct the appointment of a chapter 11 trustee.

For the foregoing reasons the Movants respectfully request that the Court (i) order the appointment of a chapter 11 trustee over Continental Exploration, LLC and (ii) order such other and further relief as is just.

Respectfully submitted,

_____*/s/  H. Brandon Jones*_____
John Y. Bonds, III
State Bar I.D. No. 02589100
Joshua N. Eppich
State Bar I.D. No. 24050567
H. Brandon Jones
State Bar I.D. No. 24060043
Shannon, Gracey, Ratliff & Miller, L.L.P.
420 Commerce Street, Suite 500
Fort Worth, Texas 76102
(817) 336-9333 telephone
(817) 336-3735 facsimile
**COUNSEL FOR MOVANTS**

## Certificate of Conference

I hereby certify that on October 26, 2015, the undersigned counsel conferred with Eric Liepins, counsel for Debtor, via email and telephone.  The Debtor opposes the relief requested by the Movants herein.

_____*/s/ H. Brandon Jones*_____
H. Brandon Jones

### Certificate of Service

I, H. Brandon Jones, certify that on October 26, 2015 a true and correct copy of the forging Motion for Entry of Order Directing the Appointment of a Chapter 11 Trustee was served on all parties requesting notice via the Court's ECF system, on the Debtor via first class and certified mail, return receipt requested (as set forth below); on Debtor's counsel via first class mail and email (as set forth below); on the United States Trustee via first class mail (as set forth below) and on all parties listed on the attached Bankruptcy Matrix via first class mail, which includes the 20 largest unsecured creditors.

*Via CMRRR*
*And First Class Mail*
Continental Exploration, LLC
1812 Wyndcliff Drive
Richardson, Texas 75082

*Via First Class Mail*
*And Email: Eric@ealpc.com*
Eric A. Liepins
Counsel for Debtor
12770 Coit Road
Suite 1100
Dallas, Texas 75251

*Via First Class Mail*
U.S. Trustee
c/o Timothy W. O'Neil
110 N. College Ave., Ste. 300
Tyler, Texas 75702

                              */s/ H. Brandon Jones*
                              H. Brandon Jones